# Board of Trustees of Policemen's Pension Fund v. Schupp, et al.

(Decided February 24, 1928.)

## Appeal from Jefferson Circuit Court (Common Pleas Branch, Second Division).

1. Statutes.—Acts 1926, c. 119, sec. 3 (Ky. Stats., Supp. 1926, sec. 2872a8), amending Acts 1912, c. 112 (Ky. Stats., secs. 2872a1 to 2872a19), which repealed Acts 1904, c. 12, by doubling pensions of policemen in first-class cities, held not to violate Constitution, sec. 156, as constituting special legislation, because affecting only one city, contrary to section 59, subsec. 29.

2. Constitutional Law.—General Assembly is representative body of sovereign people, restricted in its authority only by federal and state Constitutions.

3. Municipal Corporations.—The right of local self-government does not inhere in the municipalities of the state.

4. Constitutional Law.—State Constitution is not a grant or delegation of power by people to state government, but a limitation on power which would otherwise be absolute by virtue of its sovereignty.

5. Constitutional Law.—Constitution, sec. 156, providing for classification of cities and definition of their powers by general law, was not a grant of such authority to General Assembly, but a limitation on its otherwise absolute power to do what it pleased.

6. Municipal Corporations.—Municipal corporations are of twofold character, one purely municipal, affecting only matters of local concern, and the other governmental, in which state at large is concerned.

7. Municipal Corporations.—General Assembly may, by general laws, under Constitution, sec. 181, require municipal corporations to take such steps and impose such taxes as will provide for maintenance of order therein.

8.  Municipal Corporations.—Establishment of pension system for municipal officers and employees, retired from active service after serving certain number of years or being disabled by injuries received in course of duty, is not unconstitutional disposition of public moneys for private use as applied to those entering or continuing in service after system went into effect.

9.  Statutes.—Acts 1926, c. 119, sec. 3 (Ky. Stats., Supp. 1926, sec. 2872a8), requiring payment of $60 per month pensions to retired policemen of first-class cities, held not void as legislating for city of Louisville in matter of purely municipal concern, in violation of Constitution, sec. 181; all people of state being interested in preservation of order in such city.

10.  Municipal Corporations.—Acts 1926, c. 119, sec. 3 (Ky. Stats., Supp. 1926, sec. 2872a8), requiring payment of $50 per month pensions to retired policemen of first-class cities, held not void as invading right of city of Louisville, under Constitution, sec. 181, to levy its own taxes; Ky. Stats., secs. 2872a3, 2872a4, merely authorizing such cities to impose certain maximum tax and assessments on policemen's salaries.

11.  Statutes.—Acts 1926, c. 119, sec. 3 (Ky. Stats., Supp. 1926, sec. 2872a8), requiring payment of $60 per month to retired policemen of first-class cities, held not void as impracticable of performance, because number of pensioners is such that fund will soon prove insufficient to continue payments at that rate, in view of Ky. Stats., sec. 2872a9, providing for such contingency.

12.  Municipal Corporations.—Retired policemen, already on pension rolls of first-class city at time of enactment of Acts 1926, c. 119, sec. 3 (Ky. Stats., Supp. 1926, sec. 2872a8), held entitled to pensions at rate provided therein from time act became effective.

13.  Statutes.—Acts 1926, c. 119, sec. 3 (Ky. Stats., Supp. 1926, sec. 2872a8), doubling pensions of retired policemen in first-class cities, held not so vague and indefinite that it cannot be administered.

14.  Evidence.—Court of Appeals takes judicial cognizance of ordinances of first-class cities, under Ky. Stats., sec. 2775, and hence knows that fiscal year for city of Louisville begins September 1 and closes August 31, and that only money which policemen's pension fund trustees had from which to pay pensions for year beginning September 1, 1925, was that produced by tax of 1⅛ cents.

15.  Municipal Corporations.—When first-class city makes tax levy in any year to pay pensions to retired policemen, under Acts 1912, c. 112 (Ky. Stats., secs. 2872a1-2872a19), and distributes fund equitably among pensioners on rolls during that year, there is no balance which pensioner can claim from fund provided for any subsequent year because of nonpayment of full rate; such pension not being a debt of city, but only a gratuity.

16.  Municipal Corporations.—In administering first-class city's policemen's pension fund, under Acts 1912, c. 112 (Ky. Stats., secs. 2872a1-2872a19), as amended by Acts 1926, c. 119, sec. 3 (Ky. Stats., Supp. 1926, sec. 2872a8), board of trustees should estimate, at be-

ginning of fiscal year, how much can be paid each month, not exceeding full rate, considering number of pensioners, probable additions and fund available, pay such amount each month, increase or decrease payment for last month to take care of any situation resulting from deaths or additions during year, and carry over any balance after paying full rate to next year, but, if unable to pay in full, does not owe pensioners any balance.

GARDNER K. BYERS, WM. T. BASKETT and ROWAN HARDIN for appellant.

CHARLES W. MORRIS, OSCAR LEIBSON and W.M. FLEISCH-AKER for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Affirming.

By the judgment appealed from, the trial court sustained the validity of chapter 119 of the Acts of the General Assembly of 1926, and adjudged that the appellees, Schupp et al., were entitled to the benefits of that act accruing on and after the 16th of June of that year, the date that that act became effective, and the board of trustees of the policemen's pension fund of the city of Louisville, which we shall refer to as the board, has appealed.

In 1912 the General Assembly passed an act (Acts 1912, c. 112) providing for the pensioning of policemen in cities of the first, class. That act is now sections 2872a-1 to 2872a-19 of the Kentucky Statutes. That act repealed and was in lieu of a former act, passed in 1904, and being chapter 12 of the Acts of the General Assembly for that year. See Head v. Jacobs, 150 Ky. 290, 150 S. W. 349. The act of 1912 authorized cities of the first class to levy a tax rate of 1 cent on each $100 of taxable property for the purpose of creating a fund for the pensioning of policemen and their families. In 1920 the General Assembly, by chapter 126 of the Acts of that year, amended this act so as to permit such cities to levy a tax of not more than 2 cents, and that amendment is now section 2872a-3, Kentucky Statutes. In 1926, the General Assembly again amended this act, and the effect of that amendment was to multiply by two the benefits theretofore provided, and that amendment is now section 2872a-8, Kentucky Statutes (Supp. 1926). Although authorized to levy 2 cents, the general council of Louisville had not, from 1920 to 1926, ever done so, but had levied rates that varied from 1 cent to 1⅛ cents. Shortly after the passage of the amendment of 1926, the general coun-

cil levied a tax of 2 cents. The board, however, refused to recognize the validity of the amendment of 1926, and continued to pay pensions at the rate authorized by the act of 1912. Schupp and others had theretofore been pensioned and had been receiving pensions based on the old rate of $30 per month, and the board continued to pay them pensions at that rate and refused to pay them pensions at the new rate of $60 per month, which Schupp and others contended they were entitled to under the amendment of 1926; and this suit resulted.

The board, for defense, attacked this act for several reasons: (a) It contended the amendment violates section 156 of the Kentucky Constitution; (b) it contended it violates section 181, Kentucky Constitution; (c) it contended that the act is impracticable and impossible of performance. By section 156 of the Constitution it is provided that the cities and towns of this commonwealth shall, for the purposes of their organization and government, be divided into six classes, and that section further provides:

> "The organization and powers of each class shall be defined and provided for by general laws, so that all municipal corporations of the same class shall possess the same powers and be subject to the same restrictions."

In that same section it is provided that cities the population of which exceeds 100,000 shall be assigned to the first class, and, as it happens, Louisville is the only city in this state that has been assigned to that class. By section 59 of our Constitution, it is provided that the General Assembly shall not pass local or special acts concerning certain designated subjects, and by subsection 29 of that section of the Constitution, the General Assembly is denied the power to pass a special law where a general law can be made applicable, and it is insisted that this act is therefore unconstitutional, because it can affect but one city in the commonwealth at this time and is therefore special legislation. However, in the case of Woolley v. City of Louisville, 114 Ky. 556, 71 S. W. 893, 24 Ky. Law Rep. 1357, we disposed of this question by saying:

> "As long as there is only one city of 100,000 population in the state, there can be but one city of the first class, but in the meantime the Legislature must

provide by general law for the government of cities of the first class.''

And again, in the case of Hager v. Gast, 119 Ky. 502, 506, 84 S. W. 566, 27 Ky. Law Rep. 129, we said:

''The powers of the Legislature to provide for the government of cities of the first class are the same as they would be if there were 100 cities of the first class instead of one; for, if any other city, by an increase of its population comes to be placed in the first class, it will be governed by the act; otherwise the Legislature would be powerless to carry out section 156 of the Constitution.''

We had before us in the case of Ex parte City of Paducah, 125 Ky. 510, 101 S. W. 898, 31 Ky. Law Rep. 170, a question much like one of the questions in this case. Paducah is a city of the second class, and it had provided by ordinance for a police force to not exceed 18 men, and by chapter 123 of the Acts of the General Assembly for 1906, section 3140 of our Statutes had been so amended as to provide that the number of policemen and detectives in cities of the second class shall not be less than 30, in addition to the chief of police, captains of police, and lieutenants of police, and this act was attacked as unconstitutional. This court sustained the constitutionality of that act, and in doing so said:

''The Constitution does not undertake to prescribe the power that the Legislature may exercise over municipal corporations. The only provision contained in it pertinent to the question under consideration is contained in section 156, declaring, in part, that 'the cities and towns of this commonwealth for the purposes of their organization and government shall be divided into six classes. The organization and powers of each class shall be defined and provided for by general laws, so that all municipal corporations of the same class shall possess the same powers and be subject to the same restrictions.' It will thus be seen that there is no conditional (constitutional) limitation upon the right of the General Assembly to enact laws for the government of cities and towns. This being true, the only obstacle in the way of the state interfering to control all the affairs of municipal government is found in the principles

announced by the courts that the right of the state to direct by legislation the affairs of these municipal corporations is confined to the powers that they exercise as a part of the state government, and does not extend to functions performed by them merely for the convenience and benefit of the inhabitants.''

Further in that case we said:

''The right of local self-government is strongly established in this state, and has been amply recognized in a long line of decisions; but in matters concerning the administration of justice, the preservation of the peace, and the like, the right of legislative control has been freely granted and exercised, and this view is in harmony with the general current of authorities.''

While there is much in this last cited case that is applicable to contention (b), it properly belongs under contention (a), and Judge Carroll in writing this opinion based the court's finding upon the proper section of our Constitution. Much of the confusion that might arise in considering cases of this kind will be removed by a few moments' reflection upon the power of the General Assembly of Kentucky. The people of Kentucky are a free, a sovereign people, and when the duly accredited representatives of that people meet in general assembly, that sovereignty inheres in that assembly. It does not look or have to look to Constitutions for grant of its authority, for it is the representative body of a sovereign people, recognizing no human authority above itself and restricted only by those limitations which have been, for the common good, yielded to the federal government, and those which for our common safety have been embodied in our state Constitution.

The theory that the right of local self-government inheres in the municipalities of this state is essentially unsound, and is based upon the now discarded doctrine that the Constitution of this state is a grant or delegation of power by the people of the state to the state government, and is not, as is now generally recognized, a limitation upon a power which, merely by virtue of its sovereignty, would otherwise be absolute. When this section of the Constitution provided for the classification of cities for their organization and a definition of their powers by general law, that was not a grant to the General Assem-

bly of authority so to do, but was a limitation upon what, without these limitations, would be the absolute power of the General Assembly to do what it pleased. When we look at these questions from this position, and view our Constitution not as a grant of authority, but as a series of limitations upon what would otherwise be the absolute power of the General Assembly, the solution of this case presents no difficulty. This disposes of contention (a).

We come now to contention (b), which is based on section 181 of the Constitution, which is:

> "The General Assembly shall not impose taxes for the purposes of any county, city, town, or other muncipal corporation, but may, by general laws, confer on the proper authorities thereof, respectively, the power to assess and collect such taxes. The General Assembly may, by general laws only, provide for the payment of license fees on franchises, stocks used for breeding purposes, the various trades, occupations and professions, or a special or excise tax; and may, by general laws, delegate the power to counties, towns, cities and other municipal corporations, to impose and collect license fees on stock used for breeding purposes, on franchises, trades, occupations and professions."

It is evident from a reading of section 181 that the makers of our Constitution realized and provided for the twofold character of municipal corporations. One of these is purely municipal, affecting only local matters of concern to no one in particular except the inhabitants of the particular municipality. The other is its governmental character, in which the state at large is concerned. This twofold character is well pointed out in 19 R. C. L. p. 697, sec. 9, and in 43 C. J. p. 179, sec. 178. The general public of the state is not interested in the imposition of taxes for purely municipal purposes, and the General Assembly is forbidden to levy such taxes, but the general public is interested in the maintenance of order in all municipalities of the commonwealth, and the General Assembly may by general laws, require municipal corporations to take such steps and to impose such taxes as will provide for the maintenance of order. The general public is interested in the education of all the people of the state, and in the case of City of Louisville v. Com., 134 Ky. 488, 121 S. W. 411, an act of the General Assem-

bly passed in 1908, being chapter 61 of the laws of. that
year, was attacked as unconstitutional. In that act the
General Assembly provided that the minimum taxes to
be levied for school purposes in cities of the first class
should be 36 cents on the $100, and this act was assailed
on the ground that it violated section 181 of the Consti-
tution, and in disposing of that question we said:

> "The section in question does not pertain to
> municipal affairs, nor does it attempt to levy a tax
> therefor. It is competent for the state to administer
> its government through such agencies as the Legisla-
> ture may choose, when the Constitution does not
> expressly provide otherwise. In the establishment
> and maintenance of an efficient system of common
> schools, the Legislature was left a free hand as to
> the details of management and government, as well
> as the matter of levying taxes. It was therefore
> competent for the Legislature to have laid all the
> taxes for that purpose directly, or, as it did, to levy
> part directly and provide for the raising of the resi-
> due through other agencies which it established. . ..
>
> "Our conclusion is that the statute is a valid
> exercise of legislative power and discretion."

Thus we see that state legislation concerning schools
within the city of Louisville was upheld, because the
education of the people of the state is a matter of
public concern, and, if that be true, then is not the pro-
tection of life and property and the safeguarding of the
public peace in the city of Louisville also a matter of
public concern? If it is a matter of public concern, then
the General Assembly may enact such legislation as will
insure provisions therefor, and that brings us to the ques-
tion: Is the pensioning of policemen in the city of Louis-
ville a matter of public concern?

> "The establishment of a pension system for
> municipal officers and employees, whereby, after
> serving a number of years or upon disablement from
> injuries received in the course of their duties, they
> are retired from active service and paid a certain
> proportion of their salaries for the remainder of
> their lives is not an unconstitutional disposition of
> public moneys for private use when applied to officers
> and employees who have entered or continued in the

service after the system went into effect. . . . A judiciously administered pension fund is doubtless a potent agency in securing and retaining the services of the most faithful and efficient class of men connected with those arms of the municipal service in which every property owner and resident of the city is most vitally interested. Reasons in support of this proposition need not be stated in detail. They are such as readily suggest themselves to every reflecting mind.'' 19 R. C. L. 726, 727.

It may be argued that the correctness of this is admitted, but that when the General Assembly undertakes to say that a pension of $60 per month shall be paid to the various beneficiaries set out in section 2872a-8, that it thereby undertakes to legislate for the city of Louisville in a matter of purely municipal concern; but, as we have seen, the matter is not one of purely municipal concern. All the people in the state are vitally interested in the preservation of order in the various cities of the state, for they all have occasion to visit those cities and to be and trade therein from time to time, and the general prosperity of the state is so intimately connected and associated with the general prosperity of the cities of the state that anything that would detract from that prosperity is a matter of public interest and concern. There is nothing that would so seriously affect the prosperity of our cities as the failure to maintain order there, failure to curb the lawless, failure to protect those who are well inclined; hence we have uniformly held that the General Assembly had the right to provide therefor and may even fix the number of police that the various cities of the state shall employ. In the case of City of Paducah v. Evitts, 120 Ky. 444, 86 S. W. 1123, 27 Ky. Law Rep. 867, we held that the General Assembly could fix the salaries of the jailer in the city of Paducah and in the case of Police Commissioners v. City of Louisville, 66 Ky. (3 Bush) 597, we held that unless restricted by some constitutional provision, the General Assembly had the right to take entire control of the police system in our cities.

Thus it would appear that, unless there is something in the Constitution to prohibit it, this legislation is valid; but it is urged that by this act the General Assembly had undertaken not only to say how much shall be paid to the various pensioners, but has invaded

the constitutional rights of the city of Louisville to levy its own taxes. The answer to that is the General Assembly did not do it. All the General Assembly did in the way of taxing was to provide by section 2872a3, Kentucky Statutes, that the general council of cities of the first class may impose a tax not exceeding 2 cents, and by section 2872a4 to provide that the board there referred to may impose certain assessments upon the monthly salaries of the policemen, but as no complaint is made about the assessments, if any, imposed upon the monthly salaries of the policemen, we are not called on to express and do not express any opinion on that, and as the General Assembly has not imposed any tax on the property, but has merely permitted the general council of cities of the first class to impose such a tax, it follows that the Legislature has merely outlined a plan by which cities of the first class may pension their policemen, which clearly it had a right to do, and it was further provided that, if the cities do pension these policemen, that the pay shall be as outlined in section 2872a8. Since the General Assembly has the right to say how many policemen shall be employed, and it would seem from the case of Paducah v. Evitts, supra, that it has a right to say how much shall be paid them, it follows that it also has the right to say what the pension of the disabled policemen shall be, if the city undertakes to provide a pension fund. We are not called on to decide whether or not the city should be compelled to maintain a pension fund. The sole question we have is, had the General Assembly the right to say what the amount of the benefits should be if the city did, pursuant to the statute, provide such a fund, and our conclusion is that the General Assembly had that right, and that the provision made does not violate section 181 of the Constitution.

The board has bottomed its opposition upon four cases which we shall now discuss. One is McDonald v. City of Louisville, 113 Ky. 425, 68 S. W. 413, 24 Ky. Law Rep. 271. That case was based upon the failure of the city council to levy a certain tax referred to as a "deficit tax," and, upon its failure, to levy a tax to create a pension fund for disabled firemen, and in that case this court upheld the action of the general council of Louisville in refusing to levy such taxes. The questions presented in that case are not presented here. The question here relates to the preservation of order and the pensioning of policemen as a part of the scheme for so doing. The

general public of the state is not interested in the fiscal policy of the city of Louisville; hence the General Assembly was held to have no right to invade the purely municipal affairs of the city of Louisville and to direct its fiscal management by requiring the imposition of this deficit tax; and in that case as well as the case of City of Lexington v. Thompson, 113 Ky. 540, 68 S. W. 477, 24 Ky. Law Rep. 384, 57 L. R. A. 775, 110 Am. St. Rep. 361, decided one week thereafter, it was held that the maintenance of the fire department and the pensioning of firemen was a matter of purely municipal concern, hence beyond the control of the General Assembly. We have before us no question of the pensioning of firemen, and are not called upon to review those cases or to state the power of the General Assembly to provide therefor; hence we express no opinion on that subject, except to say this rule is often questioned. See 43 C. J. Mun. Corp., section 179, and section 1445; 19 R. C. L., p. 762, section 67. Granting that these things are of local concern, and we then held they were, that distinguishes those cases from this one, for the right of the General Assembly to legislate for the cities upon matters of public concern is universally upheld. There are some expressions in the books which would indicate that the General Assembly has not such power regarding purely municipal matters, but there are many decisions to the contrary, and in the text of R. C. L. vol. 19, p. 729, the statement is solemnly made that the things that have been said about the lack of power of the Legislature of the states to deal with matters purely municipal, when carefully analyzed, will be found to be dicta; but whatever may be the rights of the General Assembly regarding purely municipal matters, its authority to deal with governmental matters, with matters of public concern, is unquestioned, and this pensioning of policemen as a part of the plan for the preservation of order falls within this class of municipal questions, concerning which there is not a case found denying the rights of the Legislature to deal therewith.

This disposes of contention (b), and brings us to a consideration of the practicability of the act questioned in contention (c). The board undertakes by figures to show that the act is impracticable because the number of pensioners is such that if the sums provided for in section 2872a8 are paid, the fund will soon prove insufficient, and that it will be impossible to continue the pay-

ments at the rate provided, because there will not be suf-
ficient revenue for that purpose. We are not concerned
about whether or not they are correct, for that does not
make the act impossible of performance, because by sec-
tion 2872a9 it is provided:

> "If at any time there shall not be sufficient
> money in the policemen's pension fund to pay each
> person entitled to the benefit thereof the amount
> per month as herein provided, then an equal percen-
> tage of such monthly payments shall be made to each
> beneficiary until the said fund shall be so replenished
> as to warrant the payment in full to each of said ben-
> eficiaries."

This disposes of contention (c), and brings us to
the final question in the case, and that is, does this act
apply only to those who are placed upon the pension
rolls after it became effective, or does it apply to Schupp
and others who were already upon the pension rolls at
the time of its enactment?

In Black on the Interpretation of Laws, sec. 131, we
find this:

> "An amendment of a statute by a subsequent
> act operates precisely as if the subject-matter of
> the amendment had been incorporated in the prior
> act at the time of its adoption, so far as regards any
> action had after the amendment is made, for it must
> be remembered that an amendment becomes a part
> of the original act, whether it be to change a word,
> figure, line, or entire section, or a recasting of the
> whole language."

In Gatton v. Fiscal Court of Daviess County, 169
Ky. 425, 184 S. W. 1, we quoted with approval the fol-
lowing from Cyc.:

> "Amendments to Constitutions or statutes are
> not regarded as if they had been parts of the origi-
> nal instruments, but are considered rather in the
> nature of codicils or second instruments, altering or
> rescinding the originals to the extent to which they
> are in conflict, and of course are to be treated as
> having a force superior to the originals to the extent
> of such conflict. If a constitutional amendment does
> not in terms expressly repeal a constitutional provi-
> sion, yet it covers the same subject provided for in
> such provision, the amendment will be regarded as

a substitute for it and as suspending it; and the same rule applies to statutes.''

Applying that to the question before us, it follows that Schupp and those similarly situated are entitled to receive or be paid their pensions from and after the time that this amendment became effective, to wit, June 16, 1926, at the rate provided in the amendment. A similar decision of a similar question was made in the case of Miner v. Stafford et al., 239 Ill. App. 346; also, Aitken v. Roche, 48 Cal. App. 753, 192 P. 464, and Klench v. Board of Pension Fund Commissioners (Cal. App.) 249 P. 46. We are much impressed by those cases and have therefore quoted the following extracts from them.

From the Miner case:

" 'If a change in the law affects only the remedy or procedure all rights of action are governed thereby, without regard to whether they accrued before or after such change and without regard to whether suit had been previously instituted or not, unless there is a saving clause as to existing litigation.' . . . It is a matter of common knowledge that during recent years living expenses have been greatly increased and that the value of money or the purchasing power thereof has been very much diminished. May we not then indulge in the presumption that the benevolent object of the Legislature in providing for a pension was to provide the widow of a policeman who lost his life in service the necessities of life?''

From the Aitken case:

"The evident purpose of the amendment was to make provision for the greatly increased cost of living. It is alleged in the petition that of the one hundred or more pensioners, who are situated similarly to the petitioner, most of them are old, disabled, and infirm and unfit for active service in the police department or elsewhere, and that others are widows and children, largely dependent upon their pensions. The increased cost of living peculiarly affects persons so situated, and the reasons which actuated the voters of San Francisco to increase the pensions of men on the active list of the police department apply quite as strongly to those members of the police department who are not on the active list.''

From the Klench case:

> "An increase in the cost of living always justly calls for an increase in the compensation of those who labor to earn a livelihood, and this proposition obviously applies as well to those who labor for the public as those engaged in private employment, and, of course, equally so to those who, for reasons prescribed by law, have been retired from a public service to which they devoted many years of faithful adherence."

In the case of L. & N. R. Co. v. Birochik, 207 Ky. 595, 269 S. W. 720, we said:

> "The members of this court are not going to pretend to be more ignorant than the rest of men, or that matters of common knowledge are not also known to them."

Among those things that have most forcibly been brought to our attention in the years that have intervened between 1912 and 1926 has been the increased cost of living, or, as it is sometimes stated, the diminished purchasing power of money. We had occasion to refer to this in the case of Robbins et al v. Jones' Ex'r, 211 Ky. 211, 277 S. W. 333. This is one condition with which all are familiar, and which we have constantly before us, and in the case of Com. v. International Harvester Co., 131 Ky. 562, 115 S. W. 755 (133 Am. St. Rep. 256), we said:

> "Among the aids to which the court may resort in arriving at the legislative purpose in enacting a statute which is ambiguous, is to look to the evil which it was intended to correct."

In the case of Grimes v. Cent. Life Ins. Co., 172 Ky. 18, 188 S. W. 901, we said practically the same thing in other words, and that is also true in the case of Hardy v. Russell, 181 Ky. 290, 204 S. W. 145. This diminished purchasing power of money was not a matter of which the General Assembly was ignorant, for it found it necessary in recent years to multiply by two the per diem of its members, and in like manner the federal Congress had increased the pay of its members. Wages have been advanced on every hand, and the members of this court themselves are every day reminded by their own experiences of this diminished purchasing power of money,

which, we are sure, was the thing which caused the General Assembly to pass this amendment in 1926.

It is well known that the office of policeman is fraught with dangers, and if in the discharge of his duty he loses his life, it is no more than right that those that depended upon him for bread and meat should be provided for by the municipality that he gave his life to serve, and if, perchance, he lose not his life, but lose his limb, or his health or strength is otherwise impaired, it is eminently fitting and proper that the city in the service of which he sustained these losses should feed and care for him and to provide for him at least some modicum of comfort during his remaining days. It has been written that "the laborer is worthy of his hire." No one disputes the truth of that; then does it not follow that those who labor for the public are entitled to be by the public adequately compensated for the services rendered, and if a man has given the best years of his life to such a public service, is it not fitting and proper that when he becomes enfeebled by the weight of years or injuries received, and is no longer able to serve, that he should still be fed and provided for by the city in whose service the best period of his life was spent? We find the act to be constitutional; that on and after June 16, 1926, those then or thereafter placed upon the pension rolls are entitled to receive the benefits provided for by the act. The trial court so found, and that finding is approved.

It is contended this statute is so vague and indefinite it cannot be administered, but we have not so found it. This court takes judicial cognizance of the ordinances of cities of the first class. Section 2775, Ky. St.; L. & N. R. Co. v. Galloway 219 Ky. 595 294 S. W. 135. Therefore we know that the fiscal year for the city of Louisville begins on September 1, and closes on August 31, and that for the fiscal year that began on September 1 1925, and ended August 31, 1926, the only money the board had out of which to pay pensions for that period was that produced by a tax of 1⅛ cents, which was levied in that year for that purpose. The attorneys for these litigants agree that all of this was consumed in paying pensions at the old rate in that year (which we shall call the year 1926, as it included 8 months of 1926 and only 4 months of 1925), except a small balance of $1,737.30, which was carried over and used in paying pensions during the following year, which we shall call the year 1927. Thus the pen-

sioners have received all that was due them for that year; they have had paid to them all of the pension fund that was available for that year. That is all they were entitled to, for it must be remembered this pension is not a debt of the city, but only a gratuity. When the city makes a levy in any year out of which to pay pensions, and distributes that fund equitably among the pensioners on the rolls during that year, that is an end of the matter. If that is enough to pay the full rate, well and good, and any balance may be carried over to the next year; but, if it proves to be only sufficient to pay $22.50 per month, that is an end of the matter, the pensioner enters the new year just as though the full rate had been paid. Each fiscal year is a unit. When the board pays out equitably in any year the fund available, that is all the pensioner can ask. If this does not pay the full rate, that is regrettable, but that is all; it is irrelievable; there is no balance the pensioner can claim out of the fund provided for any subsequent year.

Pensioners may die during any year and new pensioners may be added, so that in the practical administration of this fund, at the beginning of a year the board, considering the number of pensioners on the rolls, the probable additions and the fund available, should make an estimate how much can be paid each month. This cannot be more than the full rate, and it may be much less; but, whatever that estimate is, it should be paid each month, and for the month of August each year the board should increase or decrease the payment for that month to take care of any situation resulting from deaths or additions during the year. If the board shall hereafter in any year, after paying the full rate, have a balance, that shall be carried over and added to the next year; but, if it has not been able to pay in full, the pensioners must be satisfied with what is paid; the board does not owe them any balance. They enter the new year with no greater claims or rights than if they had been paid in full. Whatever may be the result in any year, whether the pensioners have been paid in full or in part, when the board has made an equitable distribution of the funds that were available, that is an end of the matter.

The judgment is affirmed.